The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Mr. Ritchie? Good morning. May it please the Court. My name is Ronald D. Ritchie. I am especially happy to be here today with a voice, because I didn't have a voice yesterday. I'm counsel for Mario Alexander Sierra-Rivera, the petitioner. The first issue I would like to address is relating to PSC, whether it's cognizable or not. We believe it is. The BIA, the board, is focused on two elements of the PSC, whether it's particular, whether it's socially distinct. The board claimed, we believe erroneously, that the PSC that was posited was permissibly overbroad. And relying upon the judge, the immigration judge had said it was overbroad because it attempted to define by virtue of the fear that the petitioner has because of a police failure to take action against a private actor, which we know is not standard. We believe PSC is particular. It has well-defined boundaries. Let me ask you, counsel, since the briefing in this case, our court has decided a case called Morales v. Garland. And the particular social group in that case, Salvadarian women who are witnesses to gang criminal activity and targeted because they filed a police report, seems to be very similar to the one you suggested here, and that was found not to be sufficient. How is yours any different from that, or for that matter, the one in our prior case, Salela? We believe it is distinguishable. I mean, first, of course, we're talking about Hunter and Mills, given that they're Salvadarian women. And in this case, reported the drug cartel activity, and then the police failed to take action. So there is that distinguishing feature. This, we believe, provides clear benchmarks for the boundaries. I mean, it's clear in this case who's in PSC and who's not. And so we believe that this case has to be looked at case by case analysis, of course. And we believe that this case is distinguishable. It has, as I mentioned, several self-limiting features. And it's clear who's in and who's not. We're talking about male gender, somebody who's of male gender, somebody who's of Honduran nationality, somebody who's reported drug cartel activity to the police. So it is different than those previous cases. Well, in Morales, it was Salvadorian women, and they were targeted because they filed a police report. That seems very similar to what you proposed here. It is, you know, I concede it is somewhat similar. But I believe that there is enough to distinguish it. And what is the distinction again, just so we're clear? Well, when we're talking about Honduran males, okay? As opposed to Honduran females? As opposed to El Salvadorian females, yes, your honors. Okay. What else? We're also talking about somebody who's reported drug cartel activity to the police, and then the police failed to take action. In the Morales case, other cases, you didn't have that component, that self-limiting feature of the police failing to take action. Well, in the Morales case, these were women who actually filed a police report. Your description of reporting to the police seems even bigger than that. Well, in this case, the petitioner did attempt to file a report. He went to the police station, and the police refused to make a police report. In fact, they told him, join the cartel or leave. So it's different in that regard. We believe that there's, you know, it's not ambiguous what the defined boundaries are. This PSG is a member of it. And, you know, the immigration judge relied upon the matter of AB, which has been vacated by the attorney general, and it's misdirected determination of the petitioner's PSG. Next, I would discuss social distinction. We believe that this case does meet that definition of social distinction, and that the home society in Honduras does recognize this group as being distinct, identifiable, and has characteristics that are visible and recognizable by others in Honduras. In fact, the government of Honduras has itself recognized that witnesses to illicit activities of criminal groups like petitioner is distinct and socially visible in the Honduran society, because the government's enacted ineffective witness protection program. I would next want to briefly discuss the nexus of the board and the immigration judge's complaint of the issues of past persecution and nexus in this case. They didn't really discuss past persecution. They just jumped to nexus. And clearly, in this case, the petitioner suffered past persecution. He was kidnapped twice by members of the drug cartel, and he received threats that he would be killed if he did not join them. And there's one central reason why the drug cartel was after him, because they wanted him to join them. They wanted him to sell drugs and cooperate with them. And he failed to do that. He refused to do that. And he even went as far as to go to the police to seek protection. Of course, the police failed to protect him. Yes. Correct. Correct. Because he hadn't done it. That's correct. So our focus would be on the future persecution, well-founded fear of future persecution, and that he's established past persecution, that he's suffered his kidnappings twice. He's received death threats. And that constitutes past persecution. And then the burden would shift to the government to show that he's the conditions of change in the country, that he would not have a well-founded fear of persecution. And because of the situation in Honduras where you have drug cartels throughout the whole country, and you have a lot of impunity by government officials, security officials, and a lot of corruption in the government, and it's even clear in these specific facts here where the petition went to the police, sought help, sought protection, and he was told, we can't help you, join up with the drug cartel or leave. I don't know that anyone would doubt that that's a responsible position for a security officer, for a police officer to take. Tell someone, well, just join up with the criminal gang or leave. And which plays into the issue that the board said, well, the petitioner could relocate. And that burden is on the government to show that where we've established past persecution. And in this case, the government didn't engage in the country report as to the cat claim, did it? Correct, it did not. Well, that's what you should be arguing. Yeah, because we're on the cat claim now, right? Almost, yes. You should be because we've pretty much got the detective group. Yes. And here it's clear that the petitioner will suffer if he turns to Honduras by or with the consent of a public official. There's willful blindness here. I mean, I would argue it's even more than willful blindness if the police officer is telling them, join the drug cartel or don't. And, yeah, the State Department of Courts, which this court has held the Gunahasa case, that's the best evidence to demonstrate country conditions and what's potentially likely to happen in the future. And the board totally disregarded that evidence. So we believe at the very least, with all the impunity there, the corruption, and that the police are even involved, according to the State Department of Courts, with these criminal gangs, that the petitioner's life is more likely, he's more likely than not to be tortured if he returns to Honduras. That's pretty much what I had. I would just, unless there's further questions, I'll sit down and reserve time for questions. Okay. Thank you, Mr. Ritchie. Ms. Stroka. Good morning, Your Honors. May it please the Court. My name is Jessica Strokas, and I represent the United States Attorney General. This court should deny the petition for review because substantial evidence supports the agency's particular social group cognizability determination, the nexus determination, and the determination that it's not more likely than not that the petitioner would suffer future torture if returned to Honduras. Beginning with the particular social group, Honduran males who reported cartel activity to the police, but the police failed to take action. I believe it was Judge Diaz and Judge Agi that pointed out that in Morales, this court determined that an analogous particular social group consisting of Salvadoran women who are witnesses to gang activity and targeted because they filed a police report, lacked both particularity and social distinction, the identical determinations that the agency had made in this case. The particular social group here lacks particularity. It lacks definable boundaries that are clearly defined, and it has traits that are amorphous over broad, diffuse, and subjective. The collection of traits here has no sharp boundary line, as the court said in Morales, and the medley of vague traits bled into those of the general Honduran population, undermining the very purpose of particularity, which is to avoid indeterminacy. The trait of having reported is itself vague, as I believe Judge Diaz pointed out, that what does having reported something mean? Does it mean that a true police report was actually taken? Does it mean that it was just said and nothing was taken? Does it mean that there has to be an investigation or any kind of further action taken by the authority? What does that term mean? That is exactly what an amorphous, overbroad, diffuse, or subjective term is. As for social distinction, again, there is a lack of evidence here showing that this group, who have reported cartel activity to the police but the police failed to take action, is recognized by others in Honduran society as being a discreet group of people. Here, there really is a dearth of evidence in this case, and the evidence indicates, quite sadly, that gang violence does affect a large swath of the public, but the country conditions evidence here doesn't show that Honduran society as a whole considers this group, again, Honduran males who reported cartel activity to the police but the police failed to take action, as being discreet from others in society. The dearth of evidence certainly doesn't compel the conclusion that this group is socially distinct. The existence of the Witness Protection Program, the single sentence in the country report about a Witness Protection Program, also does not compel social distinction here, because the group itself isn't discussing individuals who have entered into a Witness Protection Program with the authorities or who intend to testify as witnesses against a gang member, and that's what that sentence is about. It's about, again, sadly, gang members intimidating witnesses and using violence to prevent them from testifying against other gang members. I mean, that's just not what this group here is. This group, again, is Honduran males who reported cartel activity to the police. It's not Honduran males who entered into a Witness Protection Program and who failed to be protected by the police. So the record certainly doesn't compel the conclusion that this group is cognizable, but even if it did, there is no nexus in this case, and the record doesn't compel a nexus in this case. With respect to the past harm, I believe this court has already observed that the petitioner was not yet part of his group when he suffered past harm, when he was approached and kidnapped and threatened by gang members when they asked him essentially to sell drugs at his private university. And the petitioner testified as such, that he was approached because he was a student at a private university and had an access card to those grounds, and the gang wanted him to sell drugs on their behalf. With respect to the fear of future harm, being potentially on account of being a member of this group, Honduran males who reported cartel activity to the police, but the police failed to take action, there's no evidence in the record that shows that there's anyone in Honduras that has any interest in harming the petitioner for that reason,  In fact, he testified on pages 102, 104, and 107 of the record, that the gang would harm him in the future because he refused to work for them, that the gang would want revenge because he refused to work for them, and that the gang wanted to harm him because he refused them. But this court has already held that refusing to join a gang, or personal retaliation, or retribution over purely personal matters such as gang recruitment, are not cognizable bases for granting asylum. So while the petitioner may have a subjectively genuine fear of returning to Honduras, because asylum is not intended to cover the numerous personal applications that invariably characterize social relationships and interactions, where he's failed to show the cognizability of his particular social group or nexus between his fear of future harm and his membership in his group, this court should deny the petition for review. Turning to cat protection, substantial evidence also supports the denial of cat protection, where his cat claim is based on the same set of events, and the petitioner did not establish that he was more likely than not to be tortured by anyone in Honduras. He offered a statement that he had gone to the police in his hometown, and they had told him, well, you either have to get along with the cartel or you leave the area. He did leave the area, but I don't know that the BIA ever dealt with that particular statement in its opinion. I think the immigration judge noted that he'd consider it, but that would at least be some evidence that the government had declined to protect him. Your Honor, the way I read the cat determination, while the board does use the term acquiescence, the remainder of the opinion there really, to me, reads as a likelihood determination. I'm sorry to say that. I just didn't understand. I'm sorry. So to establish eligibility for cat protection, the applicant must show that it's more likely than not that he would suffer future torture, harm rising to the level of future torture, and that that action would be by or with the consent or acquiescence of the home government. Here, the way that I read the board's decision is not that it's so much an acquiescence determination, but that the agency is saying that he's not satisfied that kind of first prong, that it's not more likely than not that he would suffer future torture from any source in Honduras. Although I will point you to, there's a sentence in the board's decision there that is, moreover, he was not threatened or approached after he left the area where he had been the object of recruitment efforts. And so the board did consider that he had relocated at some point after having suffered these recruitment efforts and reported to the police. But the court didn't address the country report. I mean, they didn't address the country report. They only addressed it narrowly as to whether or not, in fact, he was a person who had actually was in a witness protection program, and therefore there was nothing that said report about that, him being a part of that, because he wasn't in there except for his one reference. But that's a procedural problem, isn't it? Your Honor. But show me, first of all, before you ask the question, where did they engage as to the CAT claim in terms of the country report? As to the CAT claim? So the CAT claim really talks more about, the CAT determination by the board really talks more about his personal individual circumstances, his particularized risk of future torture, which certainly could be informed by generalized country conditions. Absolutely. We said it is, and you can't just ignore it. That's a procedural problem. But the country conditions themselves alone, particularly where the individual has not shown in his particular circumstances and his, as opposed to the general evidence, that he's more likely than not to be. But he is. Remember, we're not talking about protective group now. We're talking about the CAT, right? Yeah. He is very particular, and I don't know why I was not included as a group, but he's a student. They target him not just because he was a young male. That is true. They put that there. But it was because he had access to the university that was closed off to the cartel. It was his access. That was very particularized. That wasn't addressed at all in terms of the CAT claim. Or the country report on how pervasive the crime is and the danger. And you have admitted kidnapping and being threatened with death is torture, right? Persecution, correct? This court has established that. Would you agree with that? I believe that this court has said that death threats can be passed persecution. That's right. So you agree with that, correct? He was kidnapped twice. Yes. And he was threatened with death, correct? Yes, I believe this court has said that death threats can constitute prosecution. And that's in the record, undisputed, correct? Yes. And his credibility has not been attacked here. Matter of fact, they said it was consistent. Is it correct? Yes, Your Honor. I will point out, though, that recently the Supreme Court in Mingdi has distinguished between credibility and satisfying the burden of proof. If that credibility alone is not enough. Well, you didn't even engage with his proof. His proof was the country report, and you didn't even engage with it. That's the problem. That's a procedural problem. Forget about it in terms of winning on the merits. You have to engage with his record. You said, well, he did, but where's the engagement with that? I believe that perhaps we're talking past each other. I don't think so, because you opened it up. That's why I let you lay out why the CAD claim was not prevailing, and then you admit that they didn't address the country report with the CAD claim. No, Your Honor, they don't. The board does not explicitly address the country report. That's the only way you can do it. Well, we have to read it. However, I will say that for CAD, and specifically when looking at precarious risk, this court has said that a country report alone, generalized evidence, is not enough. But it's not alone. That's what I'm saying. Should he give up being a student? Is that the price of his safety? I no longer want to further my – because, as he said, I want a new life. I want to have a decent, law-abiding life and be an educated person, and he had already picked his career. Is that what would be the price of him being safe in the future? That's particularized to him, is it not? Perhaps if we were talking about asylum or withholding of removal. But CAD protection has a very high burden. It is a very high burden. It's a high burden, but you have to at least give some rigor to it. You looked at it. Don't you think that's very particularized? He's a student. He was chosen because he was a college student there. Yes, Your Honor. However, I would say that when we're talking about torture convention protection, there is an expectation – I'm sorry. You're talking about some kind of protection. I didn't hear what you said. CAT protection, torture convention protection. Right. There is even an expectation that someone could relocate, that they would do what they need to do. The school is going to move for him? No, but the individual – I assume that there's more than one university in Honduras. Does the record show that? Did you even engage with that? That's the whole problem. You look at – that's what you said. He goes to college, but there are five or six other universities over here. Is that in the record? Your Honor, I believe the point that I'm trying to make is that – I understand your point, but is it in the record? We have one country report that the petitioner submitted in the record. I think it talks about – You said you believe there are several colleges that are available. Is that in the record? The other choices? No. I said I assumed that there would be more than one university. We can't take your assumption, Counselor, although I'm not dismissing your honor. I'm sure you're honorably so, but that's why we have an appellate court. We have to look at a record. Yes, Your Honor. I believe the record here shows that the petitioner did not provide any evidence other than his speculation that someone would want to torture him in the future. Counsel, could I ask – Go ahead. I think part of the problem here is understanding exactly what it is that we're reviewing when it comes to the CAC claim. Our case law indicates that unless the BIA adopts the immigration judge's opinion, we look at the BIA's opinion standing alone. Judge Agee and the Chief indicated to you some concerns that they have and, frankly, I have as well with respect to the BIA's opinion that it doesn't seem to engage with the petitioner's evidence, the statement that he made about being told that he had to cooperate with the cartel or move somewhere else in the country conditions report that the Chief talked about. On the other hand, if we are allowed to consider the immigration judge's opinion, if the BIA in fact adopted it, the BIA did engage with that evidence and said, well, you know, he did make that statement, it's credible, but I looked at the record evidence in this case and I find that the Honduran authorities are trying their level best to improve law enforcement and police effectiveness and sometimes they're ineffectual, but for the most part they are, and so I reject that claim on that basis. But we can only do that if, in fact, the BIA adopted the IJ's opinion. So what is your view on that? So the board says that there's no clear error in the immigration judge's determination, that the record does not indicate that it's more likely than not that he will face future torture in Honduras. So to the extent that the board does find no clear error, the board is looking at the immigration judge's decision there. So this court would be empowered to consider both determinations. But again, looking at the board's determination, excuse me, the board's decision here, the board really does focus on this likelihood of future torture element. But it does so in the abstract, it doesn't really engage with his evidence of the particular statement that he made that's particular to him, and the IJ did. So I get your point, at least if I, I don't know about my colleagues, agree with you that the IJ, that the BIA adopted the IJ's opinion below, then I think you're on much firmer ground as to the completeness of the analysis of the CAT claim. Yes, Your Honor. But I do also want to point out that the board does engage in some analysis in the CAT claim here as well. They say that there's no physical, past physical harm that he endured, and that he was not threatened or approached after he had left the area, where he remained from between June 2014 and the end of September 2014. Well, there's no doubt that's powerful evidence and a powerful argument. But I guess the question is, is the board allowed to go directly to that if it doesn't adopt the IJ's opinion that dealt with the other evidence, the country report, its finding of credibility as to what the petitioner testified to and that sort of thing? I guess it's sort of the same question as Judge Diaz asked. You're not incorrect to point out what the BIA did consider. I guess the bottom line of the question is, is that enough when it omits the other items? Your Honor, I will again point out to the first sentence in the CAT determination that it is reviewing the immigration judge's decision, that there's no clear error here. And so I believe that in essence what the board has done is adopted the immigration judge's decision by finding no clear error there and then adding further explanation as to why and highlighting certain parts of the evidence here. Well, under that standard then you'll say that every time they review the immigration judge's finding that that's an adoption. That's not the case. Certainly not, Your Honor. You said because they reviewed it. They didn't adopt it. That would not be what I would have said. Can you show me where they adopted it or that's an assumption? Your Honor, on page four of the board's decision, the very first sentence with respect to the respondent's application for CAT protection, there's no clear error in the immigration judge's determination. And then it goes on to discuss certain parts of the evidence. And the last sentence is we therefore affirm the immigration judge's decision denying the application. There's no clear error? No clear error and affirmance. And you're saying that's adopting? Your Honor. It tried to buttress his own opinion in the CAT claim by saying what you said, in terms of whether he moved for a month, grandparent, and that was their decision. That was their decision. It wasn't the fact that Carl Blanche said, oh, we don't find an error. They weren't adopting it. Your Honor, they say both that they find no error in the immigration judge's decision and that they affirm the decision. In my experience, and certainly you don't have to take my experience, but in my experience, when the board is affirming a decision, they're essentially looking at that decision. Affirming the decision is the decision not to grant asylum, withholding a remover, and a CAT claim. That's affirming the decision. And finding? Adopting the finding is different than reviewing and saying we affirm the decision. The decision was to deny the claim. Your Honor, I believe that that would be a fairly narrow reading of the board standard of review. I don't think it's narrow at all, but these are very important cases. I mean, literally life and death. And the whole idea is that for review in court, we have to have something to look at. The BIA is there to do that. And this was a single judge, wasn't it? I believe so, yeah. Right. So even less deference should be given to it. Skid more at best. Certainly not Chevron deference to that. Your Honor, the board routinely employs single judge panels. They may routinely do so. We also routinely look at the difference, the level in terms of deference we give to it, too. Your Honor, I see that I'm over my time. That's fine. You can keep on. I'm asking the questions. Sure. So I understand, Your Honor. The deference is lower, even though you may do it often. It's only a quick review with one. But that is the difference. Your Honor, we're not talking Chevron or Skidmore here. We're talking substantial evidence. Okay. And under the substantial evidence standard, this court would have to find that there's overwhelming evidence compelling the conclusion that the agency got it wrong here. Pretty much so. No, it's also a procedural problem, too. That's the problem. That's the finding aspect of it. But it's another procedural problem. If the court narrows in on his individual particularized risk, I believe that it would have to find that there's something in the country report that was not discussed by the board or the immigration judge that would compel the conclusion that he has a particularized risk of torture. The only thing discussed in the country report was in reference to whether or not the fact about the witness protection program in terms of that he did not put himself in that in the class. But it did not talk about in terms of how that effect is being able to relocate, the likelihood that he would still face these people, which the cartel is nationwide and all those things. It didn't say it's nationwide, but he could. It's a threat to him to kidnapping, but under his circumstance, it's not likely because. That's what we look for, and it's not there. Your Honor, I think the board engaged in that analysis. The board says the respondent fears that the cartel members whose efforts he declined would locate him elsewhere in Honduras and torture him, or that other unrelated criminals would take notice of him and torture him for their own reasons. And the board found that on this record to be speculative. It's speculative? You've already been kidnapped twice? Your Honor. I mean, let's think about the human side of this case. Attorney General, you represent Attorney General. I mean, in terms of the policy there. You're saying that most people not have kidnapped, thank God, ever in their life, but twice kidnapped and told, I'm going to kill you if you don't capitulate to our demands? And when you call that, you said that's what, for some reason we don't think it's likely it's going to happen again. Why not? What does the record say is the explanation of why not? Why wouldn't a person who they told you, we're coming back a third time, they told him that specifically, and the third time they'll be your last time, we're going to kill you. Isn't that the record? Undisputed? I believe. Is that in the record undisputed, that they said we're going to come back a third time? See, this record is pretty replete with saying it wasn't like one, two, well, we don't care if we see you again. No, it was a kidnap, kidnap, threat, and said we're coming back a third time, and if you don't do it, we say we're going to kill you. Now you tell me where in the record it says that somehow that that's less on his particularized reason in this record on a cat claim. Your Honor, I believe he was told that if he didn't join the first time that they would kill him, and they came back the second time and they did not kill him, and then the third time he left and lived elsewhere without being approached by him. Is that different from what I just said? I said they told him the second time they would be coming back a third time. I didn't say they came back a third time, because he left, he came to the United States, a place where he thought he could be safe and live in some kind of, right? Is that correct? Somewhat, Your Honor. What part did I get wrong? In June 2014, he moved an hour away to live with his grandmother, and he did not leave there until September 27, 2014. During that time he was there, he was never approached by gangs, harassed by gangs, threatened by gangs, harmed by gangs in any kind of way. And then I also want to back up to the first time that he was approached or kidnapped by gang members, he was threatened with death, I believe, that if he didn't sell drugs for them on the university campus, that they were going to kill him. And then they didn't. They did kidnap him again, or approach him again. Was he a student when he left an hour away? I believe that. Is it in the record? I believe in his testimony that he was, I'm trying to remember, he was a student at the university, which is why he was approached in April. He was approached a second time in June. It's unclear in the record if he was still a student at that point. And then it's unclear if he had left the university after he left the town he came to the United States. It's not clear if he was still involved with the university at that point. The testimony really focused on these kind of three points in time. April, he's approached, he's threatened. June, he's approached, he's threatened. June, he leaves, he makes a police report, or he attempts to make a police report, but he's told by the authorities that because he has no proof or no proof that he cannot make a report that anything happened. And what else did they tell him? And they also told him that he should either kind of get along with the gang or leave. No, he didn't say that. And he left. No, he didn't say no. The police told him leave or join the cartel. Yes, Your Honor. And you could call that a police willing and able to help him when they tell someone join the cartel is your option? So, Your Honor, for Kat, we're looking at a different kind of standard similar to able and willing, but it's the government acquiescing. Is there not acquiescing on steroids? You can't believe that. That's like a police officer. You've got to put yourself, I think, in the human side of it. You go to a police officer. You know, somebody just kidnapped me and threatened me. Well, you got any proof? Well, you don't have proof? I suggest that you leave or join the people who want to kill you, who are involved in illegal activity. You consider that to be the police officers? There's some real hope of them. That's kind of acquiescence, isn't it? Your Honor, I can't speak to acquiescence. I believe it would be a Chenery violation because the board's decision here truly reads as a likelihood determination. They don't engage in an analysis of the authorities or the public official's likelihood to acquiesce or not. They truly are looking at this individual's particular risk of future torture. So I apologize. It's not a country report. They told him that. Yes, Your Honor. What I was saying was that when looking at Kat, I do not see a government acquiescence determination in the board's decision. I see a particularized risk, a likelihood determination. And so I feel as if my hands are tied to speaking about acquiescence. But earlier you said that the board had adopted the IJ's determination and the IJ made a determination as to acquiescence, didn't he? Again, I believe that the IJ uses the term acquiescence, as does the board, in kind of a setup sentence. But, again, I don't see an analysis of the acquiescence wrong for Kat's protection. So what I see in the agency's determinations here is a focus on this individual's particularized risk of future torture. They're looking at what has happened to him and what he has said and what evidence he has presented or failed to present. And found that evidence credible. Evidence that they found credible but not compelling and not legally sufficient. But not an explanation of why it wasn't compelling because they didn't engage in it. They did not engage in it. That's a procedural problem. No matter what, at the very least, the case should be remanded for that to be done. Your Honor, I believe that this court would really have to say that there is compelling evidence in the country report that the agency did not consider, notwithstanding the immigration judge's statements, that all of the evidence was considered and that there is such compelling evidence in that country report that it's more likely than not that he would suffer future torture based on this generalized evidence. I don't think we have to do that at all. I think all we have to say is that there's nothing compelling. We have to be showing the record that it was engaged in. We can determine that it was considered. That's the procedural aspect of it. We don't have to say, fine, it was compelling or not. In that sense, the question is whether or not it was engaged in. Our case law says that. That's a procedural error. In the cases we've sent back many times in terms of that situation, they didn't engage in the evidence. We didn't have to find, oh, it's compelling. No, it is absent. The engagement is absent here. Again, Your Honor, I have to point to the immigration judge's statement that all of the evidence was considered and that the board says that they reviewed the immigration judge's decision and found no clear error in it, and they affirmed that decision. So I guess I would say to the court that the court would need to find, in order to send this case back for a redo of the CAT determination, the court would need to find that there is no engagement, that the immigration judge's statements and the board's review of it was flawed in some way, the immigration judge's statements are insufficient. And were not adopted by the BIA, and the BIA didn't address it. That's not rocket science. I think it's due process. And that if, Your Honor, the petitioner in this case did not raise a due process issue. It's always a due process issue in terms of when it comes to us. We have to look at it. You're asking this court to look at what happened below. We have to address whether or not that that was, and that's in our jurisprudence, in the Fourth Circuit and the Middle Circuit. Your Honor, I have not seen a court before address an issue that was not raised by one of the parties. The fact that he made a CAT claim does put it in question. Certainly, but this court reviews the denial of a CAT claim for substantial evidence. That's the standard of review. If, in fact, they're engaged in the evidence that was presented in the record. When they don't, that's a procedural problem. Certainly, Your Honor, but, again, I'll point you to the immigration judge's decision where it says that all of the evidence of record was considered whether or not it is specifically mentioned. And in the board's decision that they reviewed the immigration judge's decision, they found no clear error and they've affirmed it. So, perhaps we're just in disagreement on this issue. What if the, and I hate to beat a dead horse here, but the BIA opinion had stopped at that first sentence in the final paragraph where it indicates, as you said, that the record does not indicate that it's more likely than not. It's relying on the immigration judge's determination. Full stop. It says nothing more. Would you consider that to be an adoption of the IJ's opinion? If the board says there's no clear, if it's just that single sentence. Yes. Well, the board cites there this court's decision in Turkson as well as its own decision. Well, you can include those sites but then skip the rest of the analysis. I guess part of the concern is they went on to engage in an analysis which suggests that perhaps they weren't satisfied with the immigration judge's decision, i.e., they didn't adopt it. They wanted to go their own way. So, that's what I'm asking. Is that first sentence by itself, I know you've said and you think it's enough to suggest that they adopted it, but if it had been there alone. Certainly. Certainly. You know, the board there is saying there's no clear error in this decision. The board necessarily must review the immigration judge's entire decision. Frankly, I've never understood why we make these distinctions, but I think when it comes up to us, we review the entire record of all the decision makers. But our case law does indicate that the BIA, if it doesn't adopt the IJ's decision and goes its own way, then it's stuck with whatever decision it decides to make. If I may make a suggestion there, and it has come up in this case, in fact, that the board here, when it's highlighting certain aspects of the immigration judge's decision, frequently parties may want a decision made on a subject that is not subject to, that is not part of the agency's decision. So, while, for example, an immigration judge may find no past persecution or harm rising to the level of past persecution, the board, in this case, skipped a finding of harm rising to the level and went instead to the nexus of harm, went instead to the cognizability of the social group. And so this court's scope of review is being narrowed by what the board is looking at. And here we have the board saying, we are looking at the immigration judge's decision. We find no clear error in it. In its entirety. The board doesn't specifically say that it is, that it is not, that it has narrowed it in any kind of way. And again, looking at the immigration judge's decision itself, while both the board and the immigration judge have that kind of topic sentence that's very common that the agency uses, saying it's not more likely than not that you'll be tortured by or with the acquiescence of the government, both agency decisions narrow in on this particularized risk, more likely than not element of the CAT decision. And again, in the immigration judge's decision, I simply don't see an analysis of acquiescence. And so we have the board highlighting certain pieces of evidence, highlighting certain parts of the immigration judge's decision, while saying we've looked at the immigration judge's decision. There's no clear error in it, and we're going to affirm it. Another common way that the board will stylize something is adopting and affirming a decision. I apologize, I know I'm quite far over, and unless there are further questions, I likely probably should defer to my... Thank you, Ms. Storkes. Do you have anything further, Mr. Ritchie? One or two minutes, I know it's been a long morning for your honors. If I may, our position is that nowhere in the board's decision does it state that it adopts the IJ's decision relating to CAT. We would disagree with the government's position with all due respect on that. And I just want to clarify some facts. The petitioner, yes, he was a student going to school, and he was kidnapped the first time, it was in April, and in May he received a phone call from the drug cartel saying, hey, you decided to join us, are you going to join us? He declined, said no, I'm a student, I want to get an education, I want to do what's right. Then the next month, that's when they come and kidnap him again, and take him to the leader, and that's when he received the death threat from the leader. The second kidnap, the leader said, look, you've had a couple of times, opportunities to join us, what's your position? No, I'm not going to join. He said, okay, you don't join us, you're dead, next time we see you. And, you know, the board, nowhere in that one paragraph where it discusses CAT does it discuss the most important evidence in the record, which is the State Department report. So we believe definitely that the case should be remanded, if not reversed, Your Honor. Thank you. Unless there's any other questions, I'll go ahead and sit. Thank you, Mr. Ritchie and Ms. Dorcas, for your arguments, and we appreciate it, and wish you well. Thank you for helping us on this case.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz